UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF PENNSYLVANIA

GEORGIA L. MATTA, :
:
    Plaintiff : No. 4:11-CV-815
:
v. : (Judge Nealon)
:
MICHAEL J. ASTRUE, :
COMMISSIONER OF SOCIAL :
SECURITY, :
:
    Defendant :

**FILED SCRANTON**

AUG 0 1 2012

PER _____ DEPUTY CLERK

**MEMORANDUM**

**Background**

The above-captioned action is one seeking review of a decision of the Commissioner of Social Security ("Commissioner") denying Plaintiff Georgia L. Matta's claim for social security disability insurance benefits.

Plaintiff protectively filed[1] an application for disability insurance benefits on November 5, 2008, alleging disability since January 8, 2008. (Tr. 115-116). Plaintiff later amended her alleged disability onset date to October 8, 2008. (Tr. 23). She alleged disability due to diabetes mellitus, obesity, sleep apnea, degenerative disc disease, chronic obstructive pulmonary disease ("COPD"), and aneurysm of the aorta. (Doc. 1 ¶ 7), (Tr. 153).

On January 23, 2009, the Bureau of Disability Determination denied Matta's application. (Tr. 59-62). On March 24, 2009, Matta requested a hearing before an administrative law judge.

---

1. Protective filing is a term for the first time an individual contacts the Social Security Administration to file a claim for benefits. A protective filing date allows an individual to have an earlier application date than the date the application is actually signed.

(Tr. 65-66). A hearing was held on March 18, 2010, before administrative law judge Reana K. Sweeney. (Tr. 20-57). On April 21, 2010, the administrative law judge issued a decision denying Matta's application. (Tr. 8-16). Matta then requested that the Appeals Council review the administrative law judge's decision. (Tr. 6). The Appeals Council, on March 16, 2011, denied Matta's request for review. (Tr. 1-5). Thus, the administrative law judge's decision stood as the final decision of the Commissioner.

Matta then filed a complaint in this court on April 27, 2011. (Doc. 1). Supporting and opposing briefs were submitted and the appeal is now ripe for disposition. (Docs. 9, 16). For the reasons set forth below, the decision of the Commissioner denying Matta's application for disability insurance benefits will be affirmed.

Disability insurance benefits are paid to an individual if that individual is disabled and "insured," that is, the individual has worked long enough and paid social security taxes. The last date that a claimant meets the requirements of being insured is commonly referred to as the "date last insured." Matta meets the insured status requirements of the Social Security Act through December 31, 2012. (Tr. 10, 12).

Matta was born on August 31, 1951, and at all times relevant to this matter was considered a "[p]erson of advanced age"[2] whose age significantly affects her ability to adjust to other work. 20 C.F.R. §§ 404.1563(e), 416.963(e). (Tr. 25). Matta completed tenth grade in school and later received her graduate equivalency degree ("GED"). (Tr. 29). She has past

---

2. The Social Security regulations state that a person age fifty-five (55) or older is classified as "[p]erson of advanced age." 20 C.F.R. §§ 404.1563(e), 416.963(e).

relevant work experience as a cleaner and housekeeper at hotel.[3] (Tr. 16, 124). She stopped working in October 2008. (Tr. 124).

**Medical Evidence**

Matta treated with Kandra, Fierer, Kuskin Associates, Ltd., for several years. She began treating at this facility in 2005. (Tr. 219-59; 271-330). The record contains mostly treatment notes from these physicians.

In August 2005, Matta reported swelling in her left ankle. (Tr. 289-90). It was noted that she was still smoking. (Tr. 289).

In April 2006, Matta complained of a "jabbing sensation" in her chest and tingling in her left arm. (Tr. 285). It was noted that Matta had unstable angina. (Tr. 286).

In May 2006, Dr. Fierer referred Matta to a cardiologist. She treated with Ira Sackman, M.D., F.A.C.C., for evaluation of chest pain. (Tr. 319). Test results revealed a normal myocardial perfusion image, mildly reduced post pharmacologic stress ejection fraction at 48% without wall motion abnormalities noted, the post pharmacologic stress ECG was unremarkable, and the study was similar to the one in 2002. (Tr. 319). Dr. Sackman diagnosed chest pain precordial, abnormal EKG, tobacco abuse, hypertension-essential (benign), a premature ventricular contraction, and aneurysm-descending thoracic aorta repair. (Tr. 323).

---

3. The housekeeper/ cleaner's Dictionary of Occupational Titles (DOT) number is 37-2012.00 (Maids and Housekeeping Cleaners) and is defined as follows: "Perform any combination of light cleaning duties to maintain private households or commercial establishments, such as hotels and hospitals, in a clean and orderly manner. Duties may include making beds, replenishing linens, cleaning rooms and halls, and vacuuming."
http://www.onetonline.org/link/summary/37-2012.00. (Last accessed July 30, 2012).

In June 2006, Dr. Sackman diagnosed smoking or tobacco abuse, hypertension-essential (benign), a premature ventricular contraction, aneurysm-descending thoracic aorta repair, abnormal EKG, and chest pain precordial. (Tr. 330).

On August 28, 2006, Matta complained of coughing and a head cold. (Tr. 283). Matta's medications were reviewed and she was advised to return in two weeks. (Tr. 284).

In September 2006, Matta was examined for regular, ongoing medical care. (Tr. 281-82). She was advised to return in three months. (Tr. 282).

In December 2006, Matta was advised to stop smoking. (Tr. 279-80).

In January 2007, Matta was examined by Dr. Kuskin. (Tr. 256-57). Dr. Kuskin ordered a lower extremity arterial evaluation, which was normal. (Tr. 258-59).

In June 2007, Matta had an appointment for "ongoing medical management." (Tr. 249-50). She was diagnosed with COPD[4], hypertension, thyroid, tobacco use, status post thoracic aneurysm and obesity. (Tr. 250). Matta was advised to stop smoking and lose weight. (Tr. 250).

On July 7, 2007, Matta underwent an echocardiogram. (Tr. 244-46). Dr. Kandra noted that there was no evidence of left ventricular and organ damage or dysfunction due to her hypertension. (Tr. 245). He recommended close monitoring of Matta's blood pressure, weight loss, and therapy for her cardiovascular problems. (Tr. 245). Dr. Kandra also noted that Matta

---

4. COPD is defined as "a group of lung diseases that block airflow as you exhale and make it increasingly difficult for you to breathe. Emphysema and chronic asthmatic bronchitis are the two main conditions that make up COPD. In all cases, damage to your airways eventually interferes with the exchange of oxygen and carbon dioxide in your lungs. COPD is a leading cause of death and illness worldwide. Most COPD is caused by long-term smoking and can be prevented by not smoking or quitting soon after you start. This damage to your lungs can't be reversed, so treatment focuses on controlling symptoms and minimizing further damage." http://www.mayoclinic.com/health/copd/DS00916/. (Last accessed July 31, 2012).

had COPD and that the ejection fraction and the elevated pulmonary capillary wedge pressure could be an early manifestation of non-dilated cardiomyopathy with left sided heart failure. (Tr. 245).

In October 2007, Matta underwent a left lower extremity venous evaluation for swelling and pain in the left lower extremity. (Tr. 239-40, 315). The results were normal. (Tr. 239-40, 315).

In December 2007, Matta had an appointment for ongoing medical management and complained of fatigue. (Tr. 277-78). She was advised to return for a follow-up appointment in one month. (Tr. 278).

In January 2008, Matta was diagnosed with a cough, hypertension, status post aneurysm repair in 2000, and COPD. (Tr. 234).

In February 2008, Matta presented to the doctor and it was noted that she was "doing well." (Tr. 230). She was diagnosed with back pain, hypertension, COPD and diabetes mellitus. (Tr. 231). A February 28, 2008 x-ray of Matta's back revealed mild mid cervical degenerative changes and mild degenerative changes of the mid thoracic spine with no evidence of an acute compression fracture. (Tr. 231, 306).

Matta underwent a duplex abdominal aorta evaluation on February 16, 2008. (Tr. 313). The test revealed normal abdominal aortic examination with mild atherosclerosis. (Tr. 313).

In March 2008, Matta went to the doctor with complaints of a foot problem after she bumped her foot. (Tr. 228). Examinations were normal. (Tr. 228-29). Matta was diagnosed with hypertension, COPD and diabetes mellitus II. (Tr. 229).

On October 29, 2008, Matta went to the doctor complaining of left ankle swelling. (Tr.

224). Upon examination, there was minimal swelling of the left ankle and examinations of the neck, back, chest, cardiac and abdomen were normal. (Tr. 225). Matta was diagnosed with hypertension, COPD, diabetes mellitus II and status post thoracic aneurysm repair in 2000. (Tr. 225).

On November 1, 2008, Matta underwent a left lower extremity arterial evaluation and a left lower extremity venous evaluation due to left leg pain and swelling. (Tr. 220). The examinations were normal. (Tr. 220-23).

On January 9, 2009, Candelaria Legaspi, M.D., completed a Physical Residual Functional Capacity Assessment. (Tr. 260-66). Dr. Legaspi diagnosed Matta with status post aortic aneurysm repair, hypertensive diabetes mellitus, COPD (smoker), obesity, and mild cervical thoracic degenerative joint disease. (Tr. 260). Dr. Legaspi found that Matta is capable of performing light work. (Tr. 266).

In February 2009, Matta was treated for ongoing medical problems and was advised to follow-up in three months. (Tr. 274-75).

On February 12, 2009, Bernard I. Zeliger, D.O., examined Matta for complaints of pain in her left side, rib cage and chest. (Tr. 329). Dr. Zeliger noted that Matta likely has a broken wire in her chest or back where her ribs were open and the wire was used to draw the ribs back together. (Tr. 329).

On February 19, 2009, Matta underwent a CT angio of the chest, which revealed a thoracic aortic aneurysm. (Tr. 303).

On February 23, 2009, Matta was treated by Mark A. Osevala, D.O. (Tr. 327-28). He noted that Matta is status post repair of a descending thoracic aortic aneurysm with nonspecific

upper back and shoulder pain, no thoracic aortic etiology for her discomfort, and possible neuropathy or musculoskeletal issues related to her pain. (Tr. 328).

In March 2009, Matta underwent a duplex abdominal aorta evaluation. (Tr. 301). The test was normal.

In September 2009, Matta complained of swelling in her feet, especially her left foot. (Tr. 273-74).

A nerve conduction study was done in September 2009. (Tr. 294-98). The test revealed a mild right S1 radiculopathy and that a right proximal tibial neuropathy, sciatic neuropathy, or lumbosacral plexopathy may cause these findings. (Tr. 297). The remainder of the test was normal. (Tr. 297).

On September 23, 2009, Matta underwent a CT angio of the chest. (Tr. 293). The diagnosis was stable appearance of the descending thoracic aorta graft, 3.3 cm in diameter, the aorta proximal and distal to this remaining normal. (Tr. 293). It was noted that the findings were virtually identical to prior examinations dating back to 2002. (Tr. 293).

In October 2009, Matta was treated for a cold. (Tr. 271-72).

Matta had an echocardiogram on October 2, 2009. (Tr. 309-10). The test revealed a mild concentric left ventricular hypertrophy. (Tr. 310). It was recommended that Matta's blood pressure be monitored and controlled. Weight loss and therapy were also recommended.

On October 17, 2009, Matta underwent a lower extremity arterial evaluation. (Tr. 307). The results were normal. (Tr. 307).

Matta underwent a sleep apnea test in December 2009. (Tr. 331-50). It was noted that Matta's sleep was markedly improved with CPAP therapy. (Tr. 332).

On July 15, 2000, Matta went to the Wheeling Hospital in West Virginia due to chest pain for repair of a leaking thoracic aneurysm and underwent surgery due to a ruptured thoracic aneurysm. (Tr. 184-86). Upon examination, the physician's impression was status post ruptured thoracic aortic aneurysm, which was repaired, mild bilateral atelectatic changes, but no congestive heart failure or pneumonia, pulmonary capillary wedge was not elevated, and mild chronic obstructive lung disease secondary to long term cigarette smoking. (Tr. 187). On July 17, 2000, an examination revealed no evidence of deep venous thrombosis in either lower extremity. (Tr. 198).

Matta was discharged from the Wheeling Hospital on July 25, 2000, and was instructed not to drive for six weeks, not to lift more than five to ten pounds, to cleanse her incisions and to schedule a follow-up appointment. (Tr. 182).

**Standard of Review**

When considering a social security appeal, the court has plenary review of all legal issues decided by the Commissioner. See Poulos v. Commissioner of Social Security, 474 F.3d 88, 91 (3d Cir. 2007); Schaudeck v. Commissioner of Social Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999); Krysztoforski v. Chater, 55 F.3d 857, 858 (3d Cir. 1995). However, the court's review of the Commissioner's findings of fact pursuant to 42 U.S.C. § 405(g) is to determine whether those findings are supported by "substantial evidence." Id.; Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993); Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988). Factual findings which are supported by substantial evidence must be upheld. 42 U.S.C. §405(g); Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001) ("Where the ALJ's findings of fact are supported by substantial

evidence, we are bound by those findings, even if we would have decided the factual inquiry differently."); Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981) ("Findings of fact by the Secretary must be accepted as conclusive by a reviewing court if supported by substantial evidence."); Keefe v. Shalala, 71 F.3d 1060, 1062 (2d Cir. 1995); Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001); Martin v. Sullivan, 894 F.2d 1520, 1529 & 1529 n.11 (11th Cir. 1990).

Substantial evidence "does not mean a large or considerable amount of evidence, but 'rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Pierce v. Underwood, 487 U.S. 552, 565 (1988)(quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938)); Johnson v. Commissioner of Social Security, 529 F.3d 198, 200 (3d Cir. 2008); Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999). Substantial evidence has been described as more than a mere scintilla of evidence but less than a preponderance. Brown, 845 F.2d at 1213. In an adequately developed factual record substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Federal Maritime Commission, 383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other evidence in the record," Cotter, 642 F.2d at 706, and "must take into account whatever in the record fairly detracts from its weight." Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488 (1971). A single piece of evidence is not substantial evidence if the Commissioner ignores countervailing evidence or fails to resolve a conflict created by the evidence. Mason, 994 F.2d at 1064. The Commissioner must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting

certain evidence. Johnson, 529 F.3d at 203; Cotter, 642 F.2d at 706-707. Therefore, a court reviewing the decision of the Commissioner must scrutinize the record as a whole. Smith v. Califano, 637 F.2d 968, 970 (3d Cir. 1981); Dobrowolsky v. Califano, 606 F.2d 403, 407 (3d Cir. 1979).

**Sequential Evaluation Process**

To receive disability benefits, the plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 432(d)(1)(A). Furthermore,

> [a]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A).

The Commissioner utilizes a five-step process in evaluating disability insurance and supplemental security income claims. See 20 C.F.R. § 404.1520 and 20 C.F.R. § 416.920;

Poulos, 474 F.3d at 91-92. This process requires the Commissioner to consider, in sequence, whether a claimant (1) is engaging in substantial gainful activity,[5] (2) has an impairment that is severe or a combination of impairments that is severe,[6] (3) has an impairment or combination of impairments that meets or equals the requirements of a listed impairment,[7] (4) has the residual functional capacity to return to his or her past work and (5) if not, whether he or she can perform other work in the national economy. Id. As part of step four the administrative law judge must

---

5. If the claimant is engaging in substantial gainful activity, the claimant is not disabled and the sequential evaluation proceeds no further. Substantial gainful activity is work that "involves doing significant and productive physical or mental duties" and "is done (or intended) for pay or profit." 20 C.F.R. § 404.1510 and 20 C.F.R. § 416.910.

6. The determination of whether a claimant has any severe impairments, at step two of the sequential evaluation process, is a threshold test. 20 C.F.R. §§ 404.1520(c) and 416.920(c). If a claimant has no impairment or combination of impairments which significantly limits the claimant's physical or mental abilities to perform basic work activities, the claimant is "not disabled" and the evaluation process ends at step two. Id. If a claimant has any severe impairments, the evaluation process continues. 20 C.F.R. §§ 404.1520(d)-(g) and 416.920(d)-(g). Furthermore, all medically determinable impairments, severe and non-severe, are considered in the subsequent steps of the sequential evaluation process. 20 C.F.R. §§ 404.1523, 404.1545(a)(2), 416.923 and 416.945(a)(2). An impairment significantly limits a claimant's physical or mental abilities when its effect on the claimant to perform basic work activities is more than slight or minimal. Basic work activities include the ability to walk, stand, sit, lift, carry, push, pull, reach, climb, crawl, and handle. 20 C.F.R. § 404.1545(b). An individual's basic mental or non-exertional abilities include the ability to understand, carry out and remember simple instructions, and respond appropriately to supervision, coworkers and work pressures. 20 C.F.R. § 1545(c).

7. If the claimant has an impairment or combination of impairments that meets or equals a listed impairment, the claimant is disabled. If the claimant does not have an impairment or combination of impairments that meets or equals a listed impairment, the sequential evaluation process proceeds to the next step. Title 20 C.F.R. § 404.1525 explains that the listing of impairments "describes for each of the major body systems impairments that [are] consider[ed] to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience." Section 404.1525 also explains that if an impairment does not meet or medically equal the criteria of a listing an applicant for benefits may still be found disabled at a later step in the sequential evaluation process.

determine the claimant's residual functional capacity. Id.[8]

Residual functional capacity is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis. See Social Security Ruling 96-8p, 61 Fed. Reg. 34475 (July 2, 1996). A regular and continuing basis contemplates full-time employment and is defined as eight hours a day, five days per week or other similar schedule. The residual functional capacity assessment must include a discussion of the individual's abilities. Id.; 20 C.F.R. §§ 404.1545 and 416.945; Hartranft, 181 F.3d at 359 n.1 ("'Residual functional capacity' is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).").

In the present matter, the administrative law judge proceeded through the sequential evaluation process and determined at step four that Matta was not disabled. At step one, the ALJ found that Matta had not engaged in substantial gainful activity since October 8, 2008, the amended alleged onset date. (Tr. 12). At step two, the ALJ found that Matta had the severe impairments of chronic obstructive pulmonary disease and left upper extremity residuals from surgery but that Matta's impairments did not meet or equal a listed impairment, either singly or in combination. (Tr. 12-13). The ALJ proceeded to step four and found that Matta could perform her past relevant work. (Tr. 13-16). The ALJ therefore concluded that Matta is not disabled. (Tr. 16).

**Discussion**

---

8. If the claimant has the residual functional capacity to do his or her past relevant work, the claimant is not disabled.

In the brief in support of her appeal, Matta argues that the ALJ erred in determining that she is capable of performing her past relevant work and erred by failing to find that she is disabled under the Grid Rules. (Doc. 9, pgs. 4-15).

At step four of the sequential evaluation process, the ALJ determined that Matta is capable of performing her past relevant work as a cleaner/ housekeeper. (Tr. 16). At the ALJ hearing, the vocational expert testified that work as a cleaner/ housekeeper is generally performed at the light exertional level.[9] (Tr. 16, 52-56). However, the vocational expert testified that Matta performed her work as a cleaner/ housekeeper at the medium exertional level.[10] (Tr.

---

9. Light work is defined in the Social Security Regulations as follows:

> (b) *Light work.* Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. §§ 404.1567 and 416.967.

10. Medium work is defined in the Social Security Regulations as follows:

> (c) *Medium work.* Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. If someone can do medium work, we determine that he or she can do sedentary and light work.

13

16, 52-56). The ALJ evaluated Matta's residual functional capacity and determined that she is able to perform work as a cleaner/ housekeeper at the light exertional level, not at the medium exertional level. (Tr. 16). Therefore, the ALJ determined, at step four of the sequential evaluation process, that Matta is not disabled. (Tr. 16).

Matta argues that she cannot perform her past relevant work due to her COPD. (Doc. 9, pg. 8). She argues that working as a cleaner/ housekeeper involves contact with cleaners and chemicals, which would affect her COPD. (Doc. 9, pg. 8). However, on her Disability Function Report, Matta stated that cleans her house and does laundry, although she does it slower due to pain. (Tr. 135, 137). She indicated that she cleans her house for two to three hours per day. (Tr. 137). Matta did not state that her COPD restricted the ability to clean her home. Further, on her Disability Report, Matta states that her ability to work is limited due to heart and back problems, not due to COPD. (Tr. 153).

Matta also notes that the ALJ continued to question the vocational expert about other jobs that an individual with Matta's same age, education, work experience and RFC could perform. (Doc. 9, pg. 8). The vocational expert testified that such an individual would be capable of performing work as a changing room attendant and a counter clerk. (Tr. 54-56). Matta argues that the ALJ's continued questioning of the vocational expert is inconsistent with the ALJ's determination that Matta is capable of performing her past relevant work. (Doc. 9, pg. 8).

Further, Matta notes that the vocational expert testified that if an individual with her same age, education, work experience and RFC had to stop work approximately twice a day to elevate her legs, such an individual would not be able perform any work in the economy. (Doc. 9, pgs.

---

20 C.F.R. §§ 404.1567 and 416.967.

8-9) (Tr. 56). However, the ALJ determined that Matta does not need to elevate her legs when they swell because her doctors did not tell her to do so. (Tr. 16).

The Government argues that the ALJ's RFC assessment is supported by the objective evidence of record, the medical opinions of record, and Matta's activities and statements about her abilities. (Doc. 16, pgs. 7-11). The Government notes that Matta only received conservative and routine medical treatment by her primary care physicians and many examination findings were normal during the relevant period. (Doc. 16, pg. 8). The only RFC assessment of record was provided by the state agency medical consultant, which concludes that Matta is capable of performing light work with no postural, manipulative, or environmental limitations. (Doc. 16, pg. 8) (Tr. 260-66). Additionally, Government counsel argues that the ALJ's credibility determination was proper and Matta's testimony about her pain and limitations were overstated. (Doc. 16, pgs. 8-9).

The ALJ determined that Matta has the RFC to perform light work with normal breaks and that she is limited to only occasional climbing of stairs. She cannot climb ropes, ladders, scaffolds or poles. She can only occasionally stoop, kneel, crouch or squat and she is precluded from crawling. She is limited to occasional overhead reaching with her left upper extremity and limited to lifting ten pounds or less. The ALJ noted that Matta is right hand dominant, she can only occasionally be exposed to extreme cold. She cannot work in high exposed places, around fast moving machinery on the ground, around or with sharp objects and around or with toxic or caustic chemicals. (Tr. 13-16). The ALJ accounted for Matta's COPD and included environmental limitations in the RFC determination. (Tr. 15). The ALJ specifically stated that Matta could not work with chemicals. (Tr. 13-16). The ALJ also noted that, despite suffering

from COPD and having difficulty breathing, Matta continues to smoke, although she was advised numerous times by her doctors to stop smoking.[11] (Tr. 15). Upon review, the ALJ has not erred in determining Matta's RFC and has considered her limitations in rendering the decision.

Matta next argues that the ALJ erred by failing to find that she is disabled pursuant to the Grid Rules. (Doc. 9, pgs. 12-13). Matta notes that she is a person of advanced age, she does not have a high school diploma but obtained her GED and is therefore a "high school graduate or more," her previous work is unskilled and none of her skills are transferrable. (Doc. 9, pgs. 12-13). Matta argues that she meets the criteria of Grid Rules §§ 201.04 and 202.04, and is therefore precluded from performing sedentary and light duty work. (Doc. 9, pg. 13).

The Government argues that the Grid Rules do not apply. (Doc. 16, pgs. 11-12). In determining whether a claimant can perform other work, the ALJ may rely upon the Medical-Vocational Guidelines ("Grids"), 20 C.F.R. Pt. 404, Subpt. P, App. 2, Grids. See Jesurum v. Sec. of HHS, 48 F.3d 114, 117 (3d Cir. 1995). The Grids require the ALJ to consider the claimant's age, educational level, previous work experience, and RFC. Government counsel states that if a claimant can perform her past relevant work, the ALJ will not consider her vocational factors of age, education and work experience. (Doc. 16, pg. 12). Section 404.1560(b) of Title 20 of the Code of Federal Regulations provides, in part:

> (3) If you can do your past relevant work. If we find that you have the residual functional capacity to do your past relevant work, we will determine that you can still do your past work and are not disabled. We will not consider your vocational

---

11. According to WebMD, "[t]he best way to slow COPD is to quit smoking. This is the most important thing you can do. It is never too late to quit. No matter how long you have smoked or how serious your COPD is, quitting smoking can help stop the damage to your lungs." http://www.webmd.com/lung/copd/tc/chronic-obstructive-pulmonary-disease-copd-overview?page=2. (Last accessed July 31, 2012).

factors of age, education, and work experience or whether your past relevant work exists in significant numbers in the national economy.

20 C.F.R. § 404.1560(b)(3). Accordingly, the ALJ was not required to consider Matta's vocational factors of age, education and work experience.

Upon review of the administrative record, the decision of the Commissioner is supported by substantial evidence. Therefore, pursuant to 42 U.S.C. § 405(g), the decision of the Commissioner will be affirmed.

Date: August 1, 2012

_____
**United States District Judge**